**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION**

| | | |
|---|---|---|
| **STANLEY GREEN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 5:20-cv-195 (MTT)** |
| | ) | |
| **Dr. EDWARD HALE BURNSIDE, II, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## <u>ORDER</u>

Defendants Dr. Edward Burnside and Dr. Eric Fogam move for summary judgment on plaintiff Stanley Green's Eighth Amendment claim.  Doc. 104.  This Court has had reason to question whether medical care for state prisoners meets constitutional standards.  But not here.  For the following reasons, the defendants' motion (Doc. 104) is **GRANTED**.

## I. BACKGROUND[1]

Beginning on March 27, 2018, and at all relevant times, Green was housed as a state prisoner and the defendants were internal medicine physicians at the Georgia Diagnostic and Classification Prison ("GDCP").  Doc. 104-2 ¶¶ 1-2, 4, 11.

---

[1] Unless otherwise stated, these facts are undisputed and are from the defendants' statement of facts. Because, as discussed below, Green's response was struck, the motion is unopposed and the facts in the defendants' statement are therefore deemed admitted.  M.D. Ga. L.R. 56.  However, the Court further confirmed that the facts were supported by the record by "review[ing] all of the evidentiary materials submitted in support of the" defendants' motion, as well as the evidentiary materials previously submitted by Dr. James Zimmerman, Global Diagnostic Services, Inc. ("GDS"), and Green.  *United States v. One Piece of Real Prop'y*, 363 F.3d 11099, 1101-02 (11th Cir. 2004); *Reese v. Herbert*, 527 F.3d 1253, 1269-70 (11th Cir. 2008).  This review proved its necessity—the defendants' statement of facts contains false statements, including incorrect dates and misstatements of testimony.  *Compare* Doc. 104-2 ¶ 10 *with* Doc. 104-3 at 26:22-27:1; Doc. 104-2 ¶ 16 (stating both of Green's *feet* were previously amputated) *with* Doc. 104-4 at 20:16-25 (Green's *toes* were previously amputated); Doc. 104-2 ¶ 26 (stating Green saw a "medical provider" on April 4, 2018) *with* Doc. 109-26 at 18:20-19:2, 22:21-23, 26:5-7, 32:24-33:2, 91:4-7, 92:6-7, 102:23-103:1 (Dr. Fogam testified that he was the medical provider Green saw on April 4, 2018); Doc. 104-2 ¶ 30 (stating that "Green was examined on April 9" and that the nurse practitioner noted a rash "and nothing else") *with* Doc. 104-6 at 35 (the date of the examination was April 12, 2018 and the nurse practitioner noted more than a rash);  Doc. 104-2 ¶ 29 (stating 2016 instead of 2018).

**A. Green's Medical History Before His Incarceration at GDCP**

In 2001, Green was diagnosed with type two diabetes.  *Id*. ¶ 5.  He failed to properly control his diabetes following this diagnosis.  *Id*. ¶¶ 6-7.  He had a poor diet, smoked cigarettes, and engaged in intravenous drug use.  *Id*.  He was also considered "non-compliant—meaning that he did not adhere to a medical regimen to control his diabetes."  *Id*. ¶ 6.  Indeed, "[f]rom 2010 through 2014, Green did not [regularly] take his prescribed insulin to control his diabetes."  *Id*. ¶ 10; Doc. 104-3 at 26:22-28:7.  In addition to type two diabetes, Green had hypertension and venous stasis in his left leg that began "six months prior to his arrival at GDCP."  Doc. 104-2 ¶¶ 13, 26.  "Venous stasis is a circulatory problem in the lower extremities whereby blood flow . . . does not circulate back to the heart as effectively as it should."  *Id*. ¶ 14.  Venous stasis results in abnormal swelling and changes to the skin.  Docs. 104-4 at 15:24-16:2; 109-26 at 23:9-11.

In 2016, four of Green's toes on his right foot were amputated—only his small toe remained.  Doc. 104-2 ¶¶ 15-16.  And in 2017, Green's second and third toes on his left foot were amputated.  *Id*.

**B. Green's Medical History at GDCP**

*1. March 27, 2018 through June 6, 2018*

Green was fifty years old when he entered GDCP in 2018.  *Id*. ¶ 13.  During his first week, Green was "screened" and "examined" by various nurses and doctors.  *Id*. ¶ 11. These examinations confirmed that "Green's diabetes was poorly controlled"—his blood glucose value was over twelve—then a typical level for Green.  *Id*. ¶¶ 17-18 (A blood glucose "value of less than 7 indicates that [an individual's] diabetes is well controlled and a value greater than or equal to 7 indicates poor control.").  Green's

arrival examinations, specifically the findings related to his diabetes, resulted in his placement in GDCP's Chronic Care Clinic.  *Id*. ¶ 19.  GDCP's Chronic Care Clinic ensures that "patients with one or more ongoing diseases … are seen by healthcare providers more frequently and are also more closely monitored."  *Id*. ¶ 20.  However, an inmate is only seen by one of the clinic's physicians if that individual has a scheduled visit.  *Id*. ¶ 21.  Otherwise, the inmate visits with a lower-level provider, such as a nurse practitioner.  *Id*. ¶ 22.  The physicians work on different days of the week.  *Id*. ¶¶ 21-22.

On March 28, 2018, the day after he arrived at GDCP, Green was prescribed various medications, including insulin for his diabetes and "Vaseline wraps for [his] legs to treat symptoms of his venous stasis."  *Id*. ¶¶ 23-24; Doc. 104-6 at 15-17.

On April 4, 2018, Green attended his first Vaseline wrap appointment and visited Dr. Fogam "for a follow-up to treat venous stasis in his left leg," who then recommended a vascular surgeon consult.  Doc. 104-2 ¶¶ 25-27; Docs. 104-6 at 21; 109-26 at 35:7-9, 102:23-103:4.[2]  On April 5, 2018, nurse practitioner Davis performed a physical examination in which she "noted that Green's skin on his lower leg[s] was moist but appeared cracked."  Docs. 104-2 ¶ 28; 104-6 at 31.  At this examination, Green did not have any complaints.  Docs. 104-2 ¶ 28; 104-6 at 31.

On April 6, 2018, Dr. Fogam approved another vascular surgeon consultation for Green's venous stasis.  Docs. 104-2 ¶ 29; 104-6 at 32-33; 109-26 at 35:16-36:4.  On

---

[2] Dr. Fogam omits that he saw Green on April 4, 2018.  In his statement of facts, he states, "[o]n April 4, 2018, Green saw a medical care provider," and in his brief, he states the same, as well as "Dr. Fogam's first encounter with Green was around April 6."  Docs. 104-1 at 3, 7; 104-2 ¶ 26.  But Dr. Fogam testified—repeatedly—that he was the medical provider Green saw on April 4, 2018.  Doc. 109-26 at 18:20-19:2, 22:21-23, 26:5-7, 32:24-33:2, 91:4-7, 92:6-7, 102:23-103:1.  Indeed, during his deposition, Dr. Fogam's counsel specifically asked: "I want to make it sort of really clear.  The only time you actually saw Mr. Green was on April 4th of 2018; correct?"  *Id*. at 102:23-25.  Dr. Fogam answered: "Correct." *Id*. at 103:1.

April 12, 2018, Green again saw nurse Davis, who discussed Green's blood test results and "noted a rash on Green's left thigh."  Docs. 104-2 ¶¶ 30-31; 104-6 at 35.  The following day, nurse Davis requested a gastroenterologist consultation for Green.  Doc. 104-2 ¶ 32.

"On April 26, 2018, Green saw Nurse Lawson for ulcers on his feet.  Green had an intact ulcer on the only remaining toe of his right foot, and an open ulcer on his left foot.  The open ulcer on the left foot had no drainage or active bleeding."  *Id*. ¶ 33.  Green also complained of neuropathy, pain related to the nerves.  Docs. 104-6 at 39; 109-29 at 66:20-24.  Although Green did not have a fever and there were no signs of an infection, nurse Lawson prescribed an antibiotic for Green's ulcers.  Docs. 104-2 ¶¶ 34-35; 104-6 at 40; 109-31 at 66:1-11.  She also requested a vascular surgeon consultation that Dr. Fogam approved.  Docs. 104-2 ¶¶ 34-35; 104-6 at 40.

On May 2, 2018, Green saw Dr. Fowlkes.  Doc. 104-2 ¶ 36.  At this visit, Dr. Fowlkes examined Green's right leg ulcer.  *Id*.; Docs. 104-6 at 42; 109-29 at 75:15-17.  Dr. Fowlkes noted that, other than "superficial cracking" to Green's skin on his legs, there was no sign of abnormality, his ulcer had healed, he "was in no acute distress," and he did not have a fever.  Doc. 104-2 ¶ 36.

On May 7, 2018, Green saw Dr. Agarwal, the vascular surgeon.  *Id*. ¶¶ 37-38.  At this appointment, Green did not have an infection.  *Id*. ¶ 38.  However, Dr. Agarwal confirmed that Green had venous stasis and "recommended a treatment protocol … that included Johst stockings, diabetic shoes, Amlactin skin lotion, and Neurontin."  *Id*.

On May 17, 2018, Dr. Fogam examined Green through a telehealth visit for his anemia.  *Id*. ¶ 39; Doc. 109-26 at 18:10-12.

On May 22, 2018, Green visited with nurse Dreaden and he complained "of denuded and peeling skin, and bleeding, on his lower left leg," but he "had no complaints about his right leg."  Doc. 104-2 ¶¶ 40-41.  Nurse Dreaden noted that Green did not have a fever, that there was no sign of an infection, "and that he had hyperpigmentation on his lower leg[s] with a one-centimeter ulceration to the big toes on his left foot."  *Id*. ¶ 42; Docs. 104-6 at 53; 104-4 at 35:1-7.  It was recommended to Green to continue the treatment protocol recommended by Dr. Agarwal and "to schedule a follow-up appointment in two [to three] weeks."  Docs. 104-2 ¶ 43; 104-6 at 53.

On May 30, 2018, Green saw nurse Dreaden due to sharp pain and swelling in his right leg.  Doc. 104-2 ¶ 44.  In addition to a swollen right foot, nurse Dreaden again "noted a one-centimeter ulceration on Green's left big toe."  *Id*. ¶ 45.  Even though Green had pain and swelling on his right leg, nurse Dreaden did not note any sign of infection because his symptoms were "classic" of venous stasis and Green did not have a fever.  *Id*. ¶¶ 46-47.  Nurse Dreaden further prescribed Motrin for pain and the same treatment protocol previously recommended by Dr. Agarwal.  *Id*. ¶ 49.

On June 6, 2018, Green reviewed his lab work with a medical provider.  *Id*. ¶ 52.  His blood tests did not indicate any infection or warrant immediate hospitalization.  *Id*. ¶¶ 50-51.  He did not have a fever at this appointment.  *Id*. ¶ 52.

*2. June 7, 2018 through June 19, 2018*

On June 7, 2018, Green visited Dr. Burnside.  *Id*. ¶ 53; 105-9 ¶ 6.  Green's blood glucose level was 7.5, indicative of "an improvement in his overall diabetic condition," he had no fever, and there was no sign of infection.  Doc. 104-2 ¶¶ 55-56.  However, Green had "a bleeding ulcer at the end of the only remaining toe on his right foot," and

Dr. Burnside "discussed with Green the high risk of Green losing his foot." *Id.* ¶¶ 53, 57;

Doc. 105-9 ¶¶ 6, 8.  Noting his physical finding of "right foot only toe in 5th toe with

bleeding ulcer," Dr. Burnside ordered an "urgent" consult with a vascular surgeon.

Docs. 104-2 ¶ 59; 104-6 at 64; 104-7 at 105:3-6; 105-9 ¶ 7.  Dr. Burnside also ordered

an urgent consultation with the wound clinic and an x-ray of Green's foot.  Docs. 104-2

¶ 59; 104-7 at 105:3-6.  He "prescribed Trental to help improve blood flow to Green's

foot" and vitamin C.  Docs. 104-2 ¶ 59; 104-6 at 59.  And pursuant to Dr. Agarwal's

recommendation, he "changed Green's prescription from Cymbalta to Neurontin."  Doc.

104-2 ¶ 59.  Finally, in accordance with Dr. Burnside's direction, Green went "to the

treatment room to receive care for the bleeding ulcer on his right toe." *Id.* ¶ 60.  This

June 7, 2018 visit was the first and only time Dr. Burnside met with Green.  Doc. 104-7

at 48:17-20.

Green's right foot was x-rayed on June 11, 2018.  Doc. 104-2 ¶ 62.  On June 12,

2018, Dr. Zimmerman, a radiologist, reviewed the x-ray images and reported:

> The patient is status post amputation of the great and fourth toes at the
> MTP joints and the second and third toes at the PIP joints. There is soft
> tissue swelling. There is no acute fracture, dislocation or bony erosion.
> There is a plantar calcaneal spur.
>
> IMPRESSION:
>
> 1. Status post amputation of the first and fourth toes at the MTP joints
>    and of the second and third toes at the PIP joints with soft tissue
>    swelling. There is some soft tissue gas over the second and third
>    proximal phalanges. **There is no acute fracture, dislocation, or
>    bony erosion to suggest osteomyelitis**.
>
> 2. Plantar calcaneal spur predisposes to plantar fasciitis.

Docs. 104-2 ¶ 66; 104-6 at 67; 105-9 ¶ 9 (emphasis added).  According to Green's

expert, Dr. Zimmerman, who was employed or associated with GDS, breached the

standard of care in at least two respects.  First, the x-ray, contrary to Dr. Zimmerman's

report, was "suspicious for osteomyelitis."  Doc. 110-2 at 3.  Second, and particularly

critical with respect to Dr. Fogam, Dr. Zimmerman should

> have reported these findings as concerning for osteomyelitis and
> recommended MRI to further evaluate the extent of the abnormality.  In a
> situation like this that suggests a need for urgent intervention, it is also the
> responsibility of the radiologist to notify the ordering provider of the
> abnormality through non-routine communication, such as a phone call or
> secure e-mail.

*Id*.[3]

GDS emailed Dr. Zimmerman's report to GDCP on June 12, 2018.  Doc. 105-7.

Also on June 12, 2018, a nurse examined Green.  Doc. 104-2 ¶ 63.  Green did not have

a fever, his vital signs were normal, and his "right foot ulcer was intact and did not have

any offensive odor."  *Id*. ¶ 64.

On June 14, 2018, Dr. Fogam, who had not seen Green since April 4, 2018,

received and reviewed Dr. Zimmerman's x-ray report.  *Id*. ¶ 68.  Dr. Fogam then

scheduled Green to be seen by a doctor.  Doc. 109-26 at 53:25-54:1, 66:6-9, 97:3-4,

99:1-5, 114:8-13.

On June 15, 2018, around 9:30 p.m., Green visited the wound care clinic and

stated that he "felt fine."  Doc. 104-2 ¶¶ 70, 73.  But at 10:35 p.m., Green reported to

GDCP's medical office with a fever and complaints of pain.  *Id*. ¶ 70.  The attending

nurse called Dr. Fogam and informed him of Green's condition, and Dr. Fogam then

ordered that Green be transported to the emergency room at Spalding Regional

Hospital.  *Id*. ¶ 71.  In the early morning hours of June 16, 2018, Green was admitted to

---

[3] Green dismissed Dr. Zimmerman and GDS with prejudice, presumably because Green settled his medical malpractice claims against them.  Doc. 117.

Spalding Regional Hospital.  *Id*. ¶ 72.  He stated to the medical personnel that his symptoms—a fever and pain, odor, and drainage from his right second toe—began one day prior.  Doc. 104-6 at 70.

Hospital doctors discovered that Green had osteomyelitis in his right foot, which resulted in sepsis.  Doc. 104-2 ¶ 75.  Based on this diagnosis, the doctors "performed a below-the-knew amputation of Green's right leg" on June 19, 2018.  *Id*. ¶ 74.

## C. Procedural History

On May 20, 2020, Green filed suit against nurse Dreaden, the Georgia Department of Corrections ("GDC"), Georgia Correctional Health Care ("GCHC"), GDS, Dr. Fowlkes, Dr. Zimmerman, Dr. Burnside, and Dr. Fogam.  Doc. 1.  He alleged five counts, all stemming from the amputation of his right leg: (1) an Eighth Amendment deliberate indifference to medical needs claim against nurse Dreaden, Dr. Fowlkes, Dr. Burnside, and Dr. Fogam; (2) a medical malpractice claim against nurse Dreaden, Dr. Fowlkes, Dr. Zimmerman, Dr. Burnside, and Dr. Fogam; (3) a supervisory liability claim against the GDC and GCHC; (4) a failure to train claim against the GDC and GCHC; and (5) a supervisory liability claim against GDS.  *Id*. ¶¶ 103-126.  The Court dismissed Green's state law claims against nurse Dreaden, Dr. Fowlkes, Dr. Burnside, and Dr. Fogam, as well as the claims against the GDC and GCHC.  Doc. 50.  Pursuant to joint stipulations, nurse Dreaden, Dr. Fowlkes, Dr. Zimmerman, and GDS were dismissed.[4] Docs. 102; 117.  As a result, only Green's Eighth Amendment claims for deliberate indifference to medical needs against Dr. Burnside and Dr. Fogam remain.

---

[4] Therefore, Dr. Fowlkes's motion for summary judgment, contained within Dr. Burnside and Dr. Fogam's motion, is **TERMINATED**.

On March 31, 2023, Dr. Burnside and Dr. Fogam moved for summary judgment. Doc. 104.  Green failed to respond to the motion by the April 21, 2023 deadline.  After receiving various reasons for the missed deadline from Green's counsel, the Court denied Green's motion for leave to file an out-of-time response and ultimately struck Green's late response.  Docs. 114; 116.

## II. STANDARD

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A factual dispute is not genuine unless, based on the evidence presented, "a reasonable jury could return a verdict for the nonmoving party."  *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991)); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  The movant may support its assertion that a fact is undisputed by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1)(A).  "When the *nonmoving* party has the burden of proof at trial, the moving party is not required to 'support its motion with affidavits or other similar material *negating* the opponent's claim[]' in order to discharge this 'initial responsibility.'"  *Four Parcels of Real Prop.*, 941 F.2d at 1437-38 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  Rather, "the moving party simply may 'show[ ]—that is, point[ ] out to the district court—that there is an absence of evidence to support the nonmoving party's case.'"  *Id.* at 1438 (quoting *Celotex*, 477 U.S. at 324) (alterations in original).

Alternatively, the movant may provide "affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial."  *Id.*

The burden then shifts to the nonmoving party, who must rebut the movant's showing "by producing … relevant and admissible evidence beyond the pleadings." *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1315 (11th Cir. 2011) (citing *Celotex*, 477 U.S. at 324).  The nonmoving party does not satisfy its burden "if the rebuttal evidence 'is merely colorable or is not significantly probative' of a disputed fact."  *Id.* (quoting *Anderson*, 477 U.S. at 249-50).  Further, where a party fails to address another party's assertion of fact as required by Fed. R. Civ. P. 56(c), "the court may … consider the fact undisputed for purposes of the motion[.]"  Fed. R. Civ. P. 56(e)(2).  However, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge … [t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Anderson*, 477 U.S. at 255.

District courts "cannot base the entry of summary judgment on the mere fact that the motion was unopposed, but, rather, must consider the merits of the motion." *United States v. One Piece of Real Property Located at 5800 SW 74th Ave., Miami, Fla.*, 363 F.3d 1099, 1101 (11th Cir. 2004).  In considering the merits of a motion for summary judgment, even an unopposed motion, district courts must "review all of the evidentiary materials submitted in support of the motion for summary judgment."  *Id.* at 1101-02.  In other words, the Court cannot simply accept the facts stated in a moving party's statement of material facts as true.  *Id.*  Rather, "the district court must … review the record and determine if there is, indeed, no genuine issue of material fact."  *Id.* at 1103 n.6.  If the review of the record "indicates a disputed issue of material fact, summary

judgment [cannot] be granted."  *Id.*

### III. DISCUSSION

The defendants argue that Green "cannot show an Eighth Amendment deliberate indifference to medical needs violation," and that even if he could, they are entitled to qualified immunity.  Doc. 104-1 at 9-19.  The defendants are correct.

The doctrine of qualified immunity "offers complete protection for government officials sued in their individual capacities if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  "Although qualified immunity provides government officials with a formidable shield, their entitlement to raise that shield is not automatic … the official bears the initial burden of raising the defense of qualified immunity by proving that he was acting within his authority."  *Est. of Cummings v. Davenport*, 906 F.3d 934, 940 (11th Cir. 2018).  "Once discretionary authority is established, the burden then shifts to the plaintiff to show that qualified immunity should not apply."  *Edwards v. Shanley*, 666 F.3d 1289, 1294 (11th Cir. 2012) (quoting *Lewis v. City of W. Palm Beach*, 561 F.3d 1288, 1291 (11th Cir. 2009)).  Here, Green has not, and could not, argue that the defendants were acting outside the scope of their discretionary authority.  Thus, the defendants are entitled to raise the shield of qualified immunity.

To overcome a qualified immunity defense, Green must establish that (1) the facts, viewed in his favor, establish a constitutional violation as to each defendant; and (2) the unconstitutionality of the defendants' conduct was clearly established at the time of the alleged violation.  *Corbitt v. Vickers*, 929 F.3d 1304, 1311 (11th Cir. 2019).  This

two-step analysis may be done in whatever order is deemed most appropriate for the case.  *Lewis*, 561 F.3d at 1291 (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

As a practical matter, Green clearly has not overcome this defense—his response was struck.  But, as noted, the Court has reviewed the entire record to determine whether the defendants are entitled to qualified immunity.

## A. The Defendants Did Not Violate Green's Eighth Amendment Rights

"The Eighth Amendment's prohibition against 'cruel and unusual punishments' protects a prisoner from 'deliberate indifference to serious medical needs.'"  *Kuhne v. Fla. Dep't of Corrs.*, 745 F.3d 1091, 1094 (11th Cir. 2014) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).  "To show that a prison official acted with deliberate indifference to serious medical needs, a plaintiff must satisfy both an objective and a subjective inquiry."  *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003).  Regarding the objective component, Green must prove "an objectively serious medical need" that, "if left unattended, poses a substantial risk of serious harm."  *Taylor v. Adams*, 221 F.3d 1254, 1258 (11th Cir. 2000) (cleaned up).  "A serious medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  *Youmans v. Gagnon*, 626 F.3d 557, 564 (11th Cir. 2010) (quoting *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1307 (11th Cir. 2009)).  "[T]he medical need must be one that, if left unattended, poses a substantial risk of serious harm."  *Mann*, 588 F.3d at 1307 (quoting *Farrow*, 320 F.3d at 1243).

With respect to the subjective component, Green must show that each defendant "(1) had subjective knowledge of a risk of serious harm, (2) disregarded that risk, and (3) acted with more than *gross* negligence."  *Wade v. McDade*, 67 F.4th 1363, 1374

(11th Cir. 2023) (emphasis in original).  Finally, Green must show that his injury was caused by the defendant's wrongful conduct.  *Goebert v. Lee Cnty.*, 510 F.3d 1312, 1326 (11th Cir. 2007).

The intensive, and generally successful, treatment Green received from the time he entered GDCP until June 7, 2018 demonstrates that his medical needs were "serious."  In 2001, he had been diagnosed with type two diabetes, which he had controlled poorly.  Doc. 104-2 ¶¶ 5, 17-18.  Four of his toes on his right foot had been amputated due to osteomyelitis, two of his toes on his left foot had been amputated, and he had developed ulcers on both feet.  Docs. 104-2 ¶¶ 15-16; 104-3 at 37:16-21; 104-6 at 59; 105-9 ¶ 5.  Green also had hypertension and was diagnosed with venous stasis. Doc. 104-2 ¶ 13.  Upon arrival at GDCP in March 2018, he was placed in the Chronic Care Clinic, prescribed insulin for his diabetes and Vaseline wraps for his venous stasis, and examined by numerous medical providers.  *Id.* ¶¶ 19, 23-41.  Indeed, his overall diabetic condition improved while at GDCP.  *Id.* ¶ 55.  Then, on June 7, 2018, he presented with a bleeding ulcer on his remaining right toe, a development that set in motion the events at issue.  *Id.* ¶ 53.

Green's diabetes and its effects, in combination with his various other health issues, establish that his medical needs were objectively serious.[5]

*1. Subjective knowledge of the risk of serious harm*

"Whether a particular defendant has subjective knowledge of the risk of serious harm is a question of fact subject to demonstration in the usual ways, including

---

[5] Dr. Burnside and Dr. Fogam state that Green's "serious medical need" was osteomyelitis.  Doc. 104-1 at 10.  However, that defines his "serious medical need" too narrowly.  Green suffered from a host of medical issues related to his diabetes prior to the osteomyelitis diagnosis.  Certainly, though, the *risk* of osteomyelitis was a serious medical need from the outset.

inference from circumstantial evidence." *Goebert v. Lee Cnty.*, 510 F.3d 1312, 1327 (11th Cir. 2007) (internal quotation marks and citation omitted).  "Each individual [d]efendant must be judged separately and on the basis of what that person knows." *Burnette v. Taylor*, 533 F.3d 1325, 1331 (11th Cir. 2008).

Dr. Burnside, an internal medicine physician, had subjective knowledge of a risk of serious harm to Green on June 7, 2018—the first and only time he met with Green— when his examination revealed a bleeding ulcer on the remaining toe on his right foot. Docs. 104-2 ¶ 53; 104-7 at 48:17-20.  Dr. Burnside had experience treating diabetic patients, including those with osteomyelitis and who required amputations, since the beginning of his medical career, and he was generally familiar with Green's medical history and his course of treatment at GDCP.  Doc. 104-7 at 10:16-11:24, 49:4-7. Although Green's condition had somewhat improved over the ten weeks he was at GDCP, the bleeding ulcer clearly posed a risk of serious harm.  Dr. Burnside's response demonstrates his subjective awareness of that risk.

Although Dr. Fogam never saw Green for the bleeding ulcer, he too had subjective knowledge of a risk of serious harm to Green.  On April 4, 2018, he saw Green to evaluate the venous stasis on his left leg and recommended a vascular consult.  Docs. 104-6 at 21; 109-26 at 35:7-9.  Dr. Fogam did not note any sign of infection on Green, but he was aware of Green's diabetes, amputations, and hypertension.  Docs. 104-6 at 21; 109-26 at 23:20-24:6.  And on April 6, 2018, he approved a vascular surgeon consultation for Green's venous stasis.  Doc. 104-6 at 21, 32.

On June 14, 2018, Dr. Fogam received and reviewed the x-ray report of Green's right foot.  Docs. 104-6 at 67; 109-26 at 45:11-13.  Although Dr. Zimmerman reported

no "suggestion" of osteomyelitis and recommended no further action, Dr. Fogam nevertheless, on his own initiative, "took steps to get Mr. Green seen on the next day." Docs. 104-6 at 67; 109-26 at 53:25-54:1, 66:6-9, 97:3-4, 99:1-5.  When Green was seen on June 15, 2018, the nurse reported chills, serious pain, a fever, and yellow drainage from his right foot's ulcers.  Docs. 104-2 ¶ 70; 104-6 at 68.  She called Dr. Fogam and informed him of Green's condition, and Dr. Fogam immediately told the nurse to send Green "to the emergency room at Spalding Regional Hospital."  Docs. 104-6 at 68-69; 109-26 at 75:25-76:3, 82:11-14.  Like Dr. Burnside, Dr. Fogam's response to Green's condition demonstrates his subjective awareness of a serious risk of harm.

 *2. Disregard of the risk by more than gross negligence*

 Dr. Burnside and Dr. Fogam argue that no reasonable jury could find that either of them disregarded the risk of serious harm Green faced.  The Court agrees.

 As Dr. Burnside states, he "did not ignore Green's condition.  Far from it."  Doc. 104-1 at 13 (citation omitted).  On June 7, 2018, the day he became aware of Green's bleeding ulcer, Dr. Burnside responded immediately.  Most significantly, he ordered an urgent vascular surgeon consultation.  Doc. 104-6 at 64.  He also ordered an x-ray, requested an urgent wound clinic consultation, "changed Green's medication from Cymbalta to Neurontin pursuant to a recommendation from a vascular surgeon," "prescribed Trental … to help improve blood circulation to Green's foot," and ordered Green to go to the treatment room to have his right foot cleaned and wrapped with gauze.  Docs. 104-1 at 13; 104-6 at 59-64; 104-7 at 107:18-23.

 Dr. Samson, a vascular surgeon retained by the defendants, testified that, in a hospital setting, he would have arranged for Green to be taken to surgery.  Doc. 104-5 at 82:18-21.  That is understandable—as a vascular surgeon, he makes that call.  But it

is also understandable that Dr. Burnside, as an internist, would refer Green to a vascular surgeon like Dr. Samson so that call could be made.  But even if it could be argued that Dr. Burnside should have done more than he did, it cannot at all be argued that he disregarded Green's serious medical needs.  He recognized the significance of Green's bleeding toe and, among other things, sought an urgent consult by an appropriate specialist.

As for Dr. Fogam, it is doubtful that Dr. Zimmerman's relatively benign though apparently negligent June 12, 2018 x-ray report alerted him to a significant change in Green's condition.  Doc. 104-6 at 67.  Still, Dr. Fogam responded to that report—he ordered that Green be seen.  Doc. 109-26 at 53:25-54:1, 66:6-9, 97:3-4, 99:1-5.  When the nurse informed him by telephone on June 15, 2018 of Green's condition, Dr. Fogam clearly became aware of a risk of serious harm to Green that required prompt attention.  Docs. 104-6 at 68-69; 109-26 at 75:25-76:3, 82:11-14.  Consequently, he immediately ordered that Green be taken to a hospital.[6]  Doc. 104-6 at 68-70.

Of course, even if it could somehow be said that Dr. Burnside or Dr. Fogam disregarded Green's serious medical needs, that is not enough—the defendants must have also "acted with more than *gross* negligence."[7]  *Wade*, 67 F.4th at 1374 (emphasis in original).  This standard requires a showing that Dr. Burnside and Dr. Fogam

---

[6] Dr. Samson, the vascular surgeon, also testified that based on the x-ray, he "would have taken [Green] immediately to surgery."  Doc. 104-5 at 88:20-21.  However, Dr. Fogam, an internist, only had the x-ray report—not the x-ray images—which indicated there was nothing of concern.  Dr. Samson, because he reviewed the x-ray images and because he is a vascular surgeon, could make that call.  But that does not begin to suggest that Dr. Fogam was more than grossly negligent.

[7] The defendants moved for summary judgment prior to the Eleventh Circuit's decision in *Wade* defining the "gross negligence" standard.  *Wade*, 67 F.4th at 1374.  Thus, their motion cites the "more than mere negligence" standard.  Doc. 104-1 at 11.  Because Green's claims arguably still fail under that lower standard, it is a non-issue.

"*recklessly disregarded* a substantial risk of serious harm to" Green.  *Id*. at 1375 (cleaned up) (emphasis added).  The record does not support such a finding.

Because neither defendant failed to act, any argument regarding their actions is a mere disagreement about the course of Green's treatment—"a classic example of a matter for medical judgment" that does not give rise to an actionable claim of deliberate indifference.  *Estelle*, 429 U.S. at 107; *Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991) ("Mere incidents of negligence or malpractice do not rise to the level of constitutional violations.").

The Court recognizes that Green's expert, an infectious disease specialist, opined that Dr. Burnside, an internist, "deviate[d] from the standard of care required" and should have immediately sent Green to the hospital.[8]  Doc. 104-4 at 115:25-116:2, 118:14-20.  And perhaps implausibly, the infectious disease specialist opined that Dr. Fogam, an internist, should have sent Green immediately to the hospital when he received Dr. Zimmerman's x-ray report.[9]  *Id*. at 104:16-105:9.  First, "a simple difference in medical opinion between the prison's medical staff and the inmate as to the latter's diagnosis or course of treatment [fails to] support a claim of cruel and unusual punishment."  *Keohane v. Fla. Dep't of Corrs. Sec'y*, 952 F.3d 1257, 1266 (11th Cir. 2020) (alterations in original).  "[I]t is axiomatic that simple medical malpractice does not rise to the level of a constitutional violation."  *Wade*, 67 F.4th at 1375.  "Although

---

[8] It is worth noting that Green's expert further clarified his answer, stating: "I don't know if there are other facilities.  You know, we say hospital which probably is the only option in terms of a facility that can do the imaging, the blood work, everything that needs to be done in an expeditious fashion."  Doc. 104-4 at 116:9-13.  Dr. Burnside did almost exactly that—he ordered an urgent wound clinic consult, ordered an x-ray, and sent Green to the treatment room as "expeditiously" as he could within the prison.

[9] Because this is not a medical malpractice action, the Court need not address whether an infectious disease specialist is competent to testify that an internist breached the standard of care.  *See* O.C.G.A. § 24-7-702.

[Green] may have desired different modes of treatment, the care [the defendants] provided did not amount to deliberate indifference." *Hamm v. Dekalb Cnty.*, 774 F.2d 1567, 1575 (11th Cir. 1985). Consequently, an argument about what either defendant *should have* done or whether the standard of care was breached is misplaced in the context of an Eighth Amendment claim. Second, accusations by a specialist that Dr. Burnside or Dr. Fogam breached the standard of care, on these facts, is quibbling. Again, both responded immediately to Green's bleeding ulcer. That an infectious disease specialist might have taken a different course does not suggest that Dr. Burnside and Dr. Fogam disregarded Green's bleeding toe, much less that they acted with more than gross negligence.

Finally, Dr. Burnside and Dr. Fogam's respective responses to Green's medical condition were also not "poor enough to constitute an unnecessary and wanton infliction of pain." *Taylor v. Adams*, 221 F.3d 1254, 1258 (11th Cir. 2000) (cleaned up). Nor did either defendant provide "grossly inadequate care," make "a decision to take an easier but less efficacious course of treatment," or provide "medical care that [was] so cursory as to amount to no treatment at all." *Melton v. Abston*, 841 F.3d 1207, 1223 (11th Cir. 2016).

In sum, no reasonable jury could find that either Dr. Burnside or Dr. Fogam disregarded Green's serious medical needs by more than gross negligence.

## B. No Violation of a "Clearly Established" Right

Because the defendants did not violate Green's constitutional rights, it is not necessary for the Court to consider the second prong of the qualified immunity analysis. *Id*. at 1225 ("Because [the defendant] did not violate [the plaintiff]'s constitutional rights, we need not reach the second prong of the qualified immunity inquiry."). However, even

if the defendants' conduct was unconstitutional, Green has failed to show that their conduct violated "clearly established" law.[10]  Again, because Green's response was struck, he necessarily failed to carry his burden.  *See Post v. City of Ft. Lauderdale*, 7 F.3d 1552, 1557 (11th Cir. 1993).

Even considering his struck response, however, Green did not, and could not, "point to any materially similar case where doctors provided the amount of care [the d]efendants provided and that conduct was nevertheless found to be unlawful." Doc. 104-1 at 18.  The Eleventh Circuit has held that, in deliberate indifference to serious medical needs cases, the "clearly established" prong of the qualified immunity analysis is "very fact specific"—a plaintiff must be able to point to an Eleventh Circuit, Georgia Supreme Court, or United States Supreme Court case that "make[s] it obvious that the defendant's acts violated the plaintiff's rights in the specific set of circumstances at issue."  *Youmans*, 626 F.3d at 563-64 ("[S]pecific cases of deliberate indifference are complicated: the threshold of deliberate indifference is connected to combinations of diverse interdependent factual elements."); *Bozeman v. Orum*, 422 F.3d 1265, 1274 (11th Cir. 2005) (Deliberate indifference to medical needs "cases are highly fact-specific and involve an array of circumstances pertinent to just what kind of notice is imputed to a government official and to the constitutional adequacy of what was done to help and

---

[10] A right becomes "clearly established" in three ways.  *Mercado v. City of Orlando*, 407 F.3d 1152, 1159 (11th Cir. 2005).  First, Green can show that a materially similar case has already been decided, consisting of binding precedent by the United States Supreme Court, the Eleventh Circuit, or the Georgia Supreme Court.  *Id*.  Second, Green can show that a broader clearly established principle should control the novel facts of the particular case—that is, the unconstitutionality of the instant conduct must be apparent by looking to the guiding principles of the previous case, irrespective of the underlying factual situation.  *Id*.  Third, Green can show that the conduct is so egregiously unconstitutional that prior case law is unnecessary.  *Id*.  The second and third methods are rarely successful—"[t]he nonexistence of a decision specifically addressing the alleged right is a significant consideration in determining whether the right is clearly established."  *Fortner v. Thomas*, 983 F.2d 1024, 1028 (11th Cir. 1993) (citing *Muhammad v. Wainwright*, 839 F.2d 1422, 1424 (11th Cir. 1987)).

when.  Most cases in which deliberate indifference is asserted are far from obvious violations of the Constitution."), *abrogated on other grounds by Kingsley v. Hendrickson*, 576 U.S. 389 (2015)); *see Pourmoghani-Esfahani v. Gee*, 625 F.3d 1313, 1318 (11th Cir. 2010) ("Questions of deliberate indifference to medical needs based on claims of delay are complicated questions because the answer is tied to the combination of many facts; a change in even one fact from a precedent … might not control in the circumstances later facing" a defendant.); *Hammonds v. Theakston*, 833 F. App'x 295, 299 (11th Cir. 2020) (internal quotation marks and citations omitted) ("We agree that, as a general matter, the deliberate disregard of a pretrial detainee's serious medical needs violates the detainee's constitutional rights.  But cases addressing deliberate indifference to serious medical needs are very fact specific, and we hold that *Estelle*'s general rule does not obviously apply to the specific circumstances of this case.").

Green did not cite any Eleventh Circuit, Georgia Supreme Court, or United States Supreme Court case to support his argument that the defendants violated clearly established law.  Instead, Green relied on Fourth Circuit precedent to argue that "because the Eighth Amendment's deliberate-indifference standard requires knowing conduct, an official who was deliberately indifferent could not also believe that their actions comported with clearly established law."  Doc. 112 at 20 (cleaned up).  Beyond the fact that that case is non-controlling, it also is inapplicable because the defendants here were *not* deliberately indifferent.[11]

---

[11] The Court notes that the Eleventh Circuit arguably has taken inconsistent positions regarding the "clearly established" prong of the qualified immunity analysis in deliberate indifference to medical needs cases.  *Compare Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1186 (11th Cir. 1994) (quoting *Hamilton v. Endell*, 981 F.2d 1062, 1066 (9th Cir. 1992) ("A finding of deliberate indifference necessarily precludes a finding of qualified immunity; prison officials who deliberately ignore the serious medical needs of inmates cannot claim that it was not apparent to a reasonable person that such actions violated the law."), *overruled in part on other grounds by Hope v. Pelzer*, 536 U.S. 730 (2002); *Greason v. Kemp*,

Accordingly, Green has failed to carry his burden and the defendants are entitled to qualified immunity.

## IV. CONCLUSION

Because the defendants are entitled to qualified immunity against Green's Eighth Amendment claim, the defendants' motion for summary judgment (Doc. 104) is **GRANTED**.[12]

**SO ORDERED**, this 13th day of September, 2023.

S/ Marc T. Treadwell
MARC T. TREADWELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT

---

891 F.2d 829, 834 n.10 (11th Cir. 1990) ("[O]ne simply cannot say that a prisoner has a clearly established constitutional right to adequate psychiatric care but that that right is not violated by a particular treatment amounting to grossly inadequate care unless some prior court has expressly so held on 'materially similar' facts.  Such an approach would add an unwarranted degree of rigidity to the law of qualified immunity.") *with Marsh v. Butler County*, 268 F.3d 1014, 1030 n.8 (11th Cir. 2001) (en banc) ("In *Hill v. Dekalb Regional Youth Detention Center*, 40 F.3d 1176, 1186 (11th Cir.1994), we see some dicta: 'a finding of deliberate indifference necessarily precludes a finding of qualified immunity'. We reject that dicta because it incorrectly jumbles the merits of an Eighth Amendment violation with the separate concept of an immunity defense."), *abrogated on other grounds by Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)); *Patel v. Lanier County*, 969 F.3d 1173, 1191 n.11 (11th Cir. 2020) (quoting *Hill*, 40 F.3d at 1186) ("We have previously suggested in dicta that '[a] finding of deliberate indifference necessarily precludes a finding of qualified immunity; prison officials who deliberately ignore the serious medical needs of inmates cannot claim that it was not apparent to a reasonable person that such actions violated the law.'  Subsequently, however, we have reserved the question whether prior decisional law must clearly establish that the specific medical issue complained of … counts as a serious medical need.  We have also opined, in dicta, that our 'general statement of law ordinarily does not preclude qualified immunity in cases involving a delay in medical treatment for a serious injury' because 'the cases are highly fact-specific and involve an array of circumstances pertinent to just what kind of notice is imputed to a government official and to the constitutional adequacy of what was done to help and when.'  We think it unlikely that an officer will be able to avail himself of qualified immunity where … the evidence allows the inference that he was aware of *and flatly ignored* a serious risk of harm requiring medical attention just because our prior case law didn't put him on notice of that risk.  Because a serious medical need is, by definition, one that has been diagnosed as needing treatment or one that would be obvious to lay people, no [defendant] can be unfairly surprised to learn that he violated the Constitution by flatly ignoring it.  We leave open the question whether an officer who takes inadequate measures to treat a dangerous condition may be entitled to qualified immunity where previous case law didn't put him on notice that his response was deficient.").

A strong argument can be made that the "dicta" better suits deliberate indifference to medical needs cases, but because the defendants were not deliberately indifferent, it's an argument that has no place here.

[12] The defendants' motion to exclude Green's expert (Doc. 103) is **TERMINATED as moot**.